Caer, J.
I understand this to he a bill for relief under the third section of the statute against usury. The object of the plaintiff is not to retain the money which he has actually received from the defendant, and used for his own purposes, but to get clear of the usury, to which the law superadds the interest and costs. He does not come full handed with proof but calls specially and particularly on the defendant for a discovery of the usury. To such bills 1 lend a willing ear: they seek not to inflict a penalty, and to make equity their hand maid in the act, but merely to escape a burden which the law has declared illegal and oppressive. Still the plaintiff’s case must be made out, to entitle him to relief.
The ground on which the bill seeks relief is, that in the bond executed by the plaintiff Grigsby, and Foote, his surety, to Weaver, on the 23rd May 1817, for 1636 dollars 44 cents, there is usury included, on which bond a judgment had been obtained, and an execution sued out and levied on the plaintiff’s property. The rate of usury, or the amount of the excess included in the bond, the plaintiff does not state. He states, that sometime in the year 1815, he borrowed of Weaver two bonds of Ewell, amounting to 466 dollars 66 cents, and 1000 dollars in money; and that the bond of the 23rd May 1817 was executed to secure these sums, together with usurious interest. It is evident, that to establish the fact of usury, as well as the amount of it, we must ascertain when the loan was made, at least the loan of the bonds. These bonds are in the record; they are for 233 dollars 33 cents each—the one is payable the 3rd February 1815, the other the 3rd February 1816; and they bear interest only from those dates. The usury is said to consist in charging interest on these bonds before they became due. Aware of the importance of fixing the date of the loan, both the bill and amended bill call for a discovery as to that. In his first answer Weaver says, that he lent Grigsby the bonds in 1814 *204 or 1815, the particular day not recollected, and that sometime after, in the year 1815, he lent him the 10Ó0 dollars, but took no security till'May 1817. Being called on by the amended bill, to answer to this point more particularly, he said, that in his answer to the original bill, he stated the loan of the bond or bonds, to have beeii in the year 1814 or 1815, but the particular date he' could not then nor could he now state, as he kept no memorandum of the transaction in writing ; but, from circumstances, he was now induced to believe, the loan of the bonds was in the year 1814 or previous thereto; he is certain the loan of the 1000 dollars was in 1815, and that the loan of the bonds was between one and two years before; he was unable to answer as to the particular time of the year the 1000 dollars was loaned, but he thought it was in the winter of 1814-15, or early in the spring of 1815. This leaves the date of the loan of the bonds entirely unfixed. Assuming that the 1000 dollars was lent in March or April 1815, the interest .on it, together with that on the bonds, from the’ times they were payable, will overgo, somewhat, the sum of 1636 dollars 44 cents; but take the latter part of May (say 28th), it brings it to 1636 dollars 38 cents,—six cents less than the bond of the 23rd May 1817. From these data it would seem that there was no usury in the bond for 1636 dollars 44 cents; for we know, that any small difference caused by the mistake of the calculator or the scrivener, can never affect the character of the transaction. Shall we reject this evidence given by the respondent ? He is most explicit in his declarations that no usury was included in the bond ; and this being a bill of discovery, the answer deserves more than common weight. But if we reject it, where shall we look for better evidence ? We must remember, that the plaintiff seeking to call the court of equity “into activity,” must shew it satisfactory proof that there is usury, and what is its amount; otherwise, it cannot relieve him. Where shall we find this proof? in the loose and vague conversations of the parties ? They are both ways; and, certainly, the declarations of Grigsby are quite as strong to prove that the transaction was fair, as *205 that it was usurious. Shall we find this proof in the conduct of the parties 1 in the order on the attorney for 1000 dollars, and the bond for 490 dollars 90 cents ? These unquestionably look suspicious ; for presents of this kind made by a borrower to a lender, are naturally set down to the score of the trade and connexion between them: but, then, these transactions are long subsequent to the original loan, nor is there any proof so to connect them with it, as to taint it in the origin: and, moreover, if it might be permitted to have that weight, it would not support this bill, which seeks relief from so much of the bond of 1636 dollars 44 cents only, as is usurious.
Great reliance is placed on the certificate of the judge of the circuit court; and it is insisted, that, as he states the verdict to be against evidence, the cases of Pleasants & al. v. Ross, and Southall v. M’Keand & al. are peremptory, that the chancellor should not be satisfied, but musí send the issue to another jury. I have examined those cases; and to my mind, the farthest they go, is to say, that as a general rule, the chancellor ought not to be satisfied, where the certificate is against the verdict; admitting, at the same time, that the rule only holds, where there is no circumstance appearing to vary the case. Thus, in Ross v. Pynes, and in M’Rae’s ex'or v. Wood's ex'or, there were two verdicts of the jury one way, and two certificates of the judges against them; and in each case the court said, that the chancellor ought to be satisfied with the finding, notwithstanding the opinion of the judge. If one verdict is peremptorily to be pronounced unsatisfactory, because of a certificate against it, why is a second to be satisfactory, with the same battery against it which prostrated the first. The chancellor is not obliged to send an issue to a jury; he is himself the trier of facts by the constitution of the court. In his discretion, and for his convenience, he may send issues to the bar of the courts of law, or try them at his own bar, for the satisfaction of his conscience: would it not seem strange, then, that because he has once sent an issue to a jury, he must continue to have new trials of it, until he can get a court and jury to *206 agree, as to the weight of evidence ? Suppose, in the meantime, he should, have changed his mind, and upon a closer examination of the record, become satisfied that an issue was unnecessary; that the case ought to be sent to a commissioner instead of a jury; or that he had no jurisdiction : must he still persevere in sending the issue to a jury ? In the case before us, he might well change his mind; for, in my opinion, the plaintiff’s proof was too defective to render an issue proper. Issues are not directed to enable parties to get a new supply of evidence where they have not enough : but, where there is clashing and conflicting evidence, leaving the fact in doubt, and rendering it necessary to weigh the character and credibility of witnesses, the chancellor, who sees them only on paper, considers that his conscience can be better satisfied by the verdict of a jury who shall see and hear them. In this case, there is no clashing. The point was to fix usury in the bond of May 1817, the consideration of which was confessedly composed of the loans of the bonds of Ewell, and the 1000 dollars. There was no charge, that usury had been taken on the 1000 dollars, but on the bonds only; and that, in calculating interest from the date of the loan, instead of the time when the bonds became due. Now, to shew this usury, it was most clear, that the date of the loan of these bonds must be somehow fixed; for without this starting point, no result could be produced. The plaintiff called on the defendant-twice for information to fix this point: he answered to each bill that he could not possibly speak as to the time, as he had taken no written memorandum; and the plaintiff could bring no witness to speak as to this date. Here, then, was a clear defect of proof, a failure to establish the very point upon which the usury, and the quantum of it, depended. It is the bounden duty of a plaintiff who calls for the solemn judgment of a court, to furnish that court with something like certainty to rest that judgment on: he may draw this from the defendant if he can; he may prove it by witnesses; he may establish it by documents; but in some way he must shew it, or he fails, and his bill should be dismissed. This is, in my mind, that *207 case: and instead of an issue, the bill ought to have been dismissed for defect of proof. But the chancellor sent the issue to a jury, and it is said lie was bound to obey the certificate of the judge of the circuit court.
Let us look a moment at this certificate. Generally, when a judge is asked to certify, he states (without detailing the proofs at all) that the weight of evidence was against the verdict; and, in such case, the chancellor can have no knowledge of what evidence was heard by the jury: but here,' the judge sets out by stating that usury was proved, and then goes into a statement of the evidence, shewing plainly on what grounds his conclusions rested; and to leave no doubt of this, he concludes his narrative, that “ such being the material facts proved, the court considered the finding of the jury clearly against evidence.” Again, the judge certifies, that no other witnesses were examined, upon the trial of the issue, but such as had heretofore given their affidavits or depositions, copies of which were found in the record. Now, there being copies in the record, of all that those witnesses had before sworn, who gave testimony on the trial of the issue, can we presume, that any one then swore differently in the face of his former oath ?- if he had, would not this have utterly discredited him? and would not such a fact have been certified, when the judge was telling us he had none but the witnesses in the record? It is to be noticed too, that there was no contradiction here, between the witnesses. But, particularly, the judge was pressed to certify, that there was no such parol evidence as would fix the time when EwelVs bonds were lent: he said, he would not make such certificate; not that there was such proof, but because he did not choose to state the evidence his certificate rested on. This seems to me very like an admission, that there was no such proof—but there did not need such admission; for, in another part of his certificate, he expressly states the proof to have been, that these bonds were lent between the 18th July 1814 and the 15th December of the same year; leaving a clear space of five months, any day of which we have as much right to assume as another. Is it possible *208 upon such guessing as this, to ask the decree of a court ? to ask it to say, that this or that particular sum composes the usury, and must be stricken off? I think not.
Both the case, then, as presented by the record, and that certified by the judge, leave this point, this vital point, unfixed. Why, then, should the chancellor have sent back the issue? It had been before two juries; all the evidence which could be obtained, we must conclude, had been adduced: could time furnish new or better proof? On the contrary, it was every day eating away something of that which existed ; witnesses die, or forget, and documents are lost.
I think, therefore, upon all these grounds, that the chancellor did right in dismissing the bill.